UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x
CITY OF TAYLOR EMPLOYEES                    :    Civil Action No. 08-cv-02752
RETIREMENT SYSTEM, Individually and on     :
Behalf of All Others Similarly Situated,    :
                                            :    CLASS ACTION
                    Plaintiff,              :
                                            :    COMPLAINT FOR VIOLATION OF THE
        vs.                                 :    FEDERAL SECURITIES LAWS
                                            :
SOCIÉTÉ GÉNÉRALE GROUP, DANIEL              :
BOUTON and ROBERT A. DAY,                   :
                                            :
                    Defendants.             :
                                            :
———————————————————— x
                                                 DEMAND FOR JURY TRIAL

## INTRODUCTION AND OVERVIEW

1.     This is a class action for violations of the anti-fraud provisions of the federal securities laws on behalf of all purchasers of the American Depositary Receipts ("ADRs") and all U.S. residents and citizens who purchased the stock of Société Générale Group ("SocGen" or the "Company") between August 1, 2005 and January 23, 2008 (the "Class Period"), who were damaged thereby (the "Class").

2.     SocGen is one of the largest French banking groups, operating in network banking, retail banking, finance and investment banking and asset management services worldwide.  The Company is headquartered in Paris, France.

3.     This case arises out of a $7 billion scandal that was first publicly disclosed in January 2008, when it began to be revealed that defendants' balance sheet was not as had been publicly represented, but rather had been misstated by billions of dollars during 2005-2007, as defendants acknowledged the truth about the Company's speculative trading practices and its subprime exposure.

4.     During the Class Period, defendants made gross misrepresentations about the value of SocGen's securities and the quality of its internal controls and risk management.  Defendants' prior misrepresentations began to be disclosed on January 24, 2008, when SocGen issued a public statement claiming that a trader named Jerôme Kerviel ("Kerviel") had single-handedly risked tens of billions of euros on behalf of the Company, causing a loss of almost $7.5 billion, and that the Company's publicly reported financial results failed to disclose billions in losses related to subprime real estate in the U.S.  SocGen's stock price dropped over $3.00 per share in one day when SocGen's trading and subprime losses were disclosed on January 24, 2008, which decrease was due to the artificial inflation caused by defendants' misleading statements coming out of SocGen's stock and ADR prices.  Thereafter, defendants added insult to injury when it came to light that Robert A. Day,

a SocGen board member and founder of Trust Company of the West, in which SocGen owns a major stake, had secretly disposed of $206 million of SocGen stock owned and/or controlled by him *before* SocGen's balance sheet manipulations were publicly revealed and long *after* SocGen's executives were advised of the Kerviel trades and perjuries.

## JURISDICTION AND VENUE

5.     The claims asserted herein arise under §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act") and Rule 10b-5. Jurisdiction is conferred by §27 of the 1934 Act. Venue is proper pursuant to §27 of the 1934 Act. SocGen's headquarters are located in Paris, France. False statements were made in this District and acts giving rise to the violations complained of occurred in this District.

## THE PARTIES

6.     Plaintiff City of Taylor General Employees Retirement System purchased SocGen ADRs during the Class Period as set forth in the attached certification and was damaged thereby.

7.     Defendant SocGen is one of the largest French banking groups with its headquarters located in Paris, France. SocGen's stock is traded under the symbol GLE on the Euronext Paris, which is an efficient market, and SocGen ADRs are traded on the over the counter market under the symbol SCGLY. According to SocGen's web site, today SocGen "is one of the largest foreign banking organizations in the United States with approximately 2,900 professions working in 13 U.S. cities."

8.     SocGen's Corporate and Investment Banking subsidiaries, Société Générale America Securities LLC, Société Générale Constellation LLC, and Société Générale Energie (USA) Corp., all have their offices at SocGen's New York branch, located at 1221 Avenue of the Americas, New York, New York. In addition, Société Générale Asset Management has its headquarters in Los Angeles, and offices on New York at 200 Park Avenue, New York, New York 10166.

9.      In the U.S., SocGen also controls asset manager The TCW Group.  In addition, SocGen's Fimat subsidiary had divisions in the United States, including Fimat USA, LLC (now known as Newedge USA, LLC) located at 630 Fifth Avenue, Rockefeller Center, Suite 500, New York, New York 10111 (as well as offices in other U.S. cities), and Fimat Preferred LLC, located at 2 Rector Street, 9th Floor, New York, New York 10006 (as well as offices in other U.S. cities).

10.     Defendant Daniel Bouton ("Bouton") was, at all relevant times, Chairman and Chief Executive Office ("CEO") of the Company.

11.     Defendant Robert A. Day ("Day") was, at all relevant times, a director of the Company.  During the last three weeks of the Class Period, Day and two foundations linked to him sold $206 million of SocGen stock at artificially inflated prices.  Specifically, Day sold $126 million in SocGen stock on January 9-10, 2008 and another $80 million on January 18, 2008.

12.     The defendants referred to in ¶¶10-11 above are herein referred to as the "Individual Defendants."

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS

13.     On August 1, 2005, in a quarterly shareholder letter published on SocGen's web site, defendants stated:

> One of the most important aspects of this business is controlling our exposure to the different types of risk (market risk, credit risk, etc.) in order to limit their impact on our profitability.  Of course, all our risk management is conducted in close conjunction with, and under the permanent supervision of the Group Risk Division.

> The risk of adverse movements in the financial markets is controlled at two levels:  Societe Generale's Board of Directors first defines a series of global exposure limits that applies to the whole division.  We then break this down into a series of more specific limits for each business activity and agent.  At the same time, we have invested in a number of highly sophisticated control systems which have already proved their worth in extreme situations, notably in the aftermath of 9/11.

14.     SocGen's quarterly shareholder letter, published on SocGen's website in February 2006, stated that SocGen's Corporate and Investment Banking division "posted exceptional revenues

in 2005, confirming the division's recognized expertise in its three key businesses: – in derivative products . . . ; in the euro capital markets, it earned the . . . No. 1 position in securitization; [and] a global leader in structured finance."

15.    The same February 2006 SocGen shareholder letter also stated:

Banking risk covers a broad spectrum and can, for example, arise if a person defaults on a loan repayment or if there is a drop in the market value of a given security. That said, there is one important distinction: financial risks materialise much faster than industrial risk.

Hence the importance of risk management and the strict procedures it entails. At Société Générale, the Risk Management Division is expected to contribute as much to the Group's development as it is to the company's bottom line. A key element in internal control, its role can prove to be a source of tension amongst the operating divisions which is why, to ensure its complete impartiality, it reports exclusively to the General management.

An inherently transverse function, its role is to both advise and audit.  With a primary remit that extends to the definition of suitable methods for the analysis, measurement, approval and monitoring or risks, the division subsequently works alongside the Group's different business lines in defining commercial and product strategies.  Thirdly, given its entirely impartial position, the Risk Management Division is called upon to monitor and approve the transaction proposals put forward by the sales managers and, lastly, centralises all Group risk issues.  In short, it is up to the Risk Division to ensure that the Group is in a position to take informed decisions on the risks that it is prepared to assume in order to enhance its profitability.

16.    With respect to SocGen's risk management, the SocGen shareholder letter stated:

Risk management – a broad gamut of expertise

When faced with a variety of risks, you need a variety of profiles. Indeed, our credit and market risk specialists that are on hand to advise on transactions interact on a daily basis with the operational teams from which they often originate. Moreover, within the research department, our economists often brush shoulders with consultant engineers. With a background in industry, the latter are often in charge of assessing the quality of the industrial infrastructures of a given borrower.

And last but certainly not least are the IT teams, there to provide the ever-demanding task of recalculating the risk on market positions each day. At the end of 2005, Société Générale Group's Risk division employed around 1,900 members of staff.

17.     With respect to SocGen's risk management expertise in derivatives, the shareholder letter claimed:

> If we rank as a leader in this field it is undeniably because we have looked to develop our expertise therein for over 20 years now. That said, the growth of this activity has only been possible, and more importantly, acceptable, thanks to the parallel development of a strong expertise in the management of risks linked to derivatives.
>
> At every step in its growth on these markets driven by the dynamism of the business line teams, Société Générale has always been careful to uphold the principles of prudence and rigour that have long applied to traditional banking activities. Furthermore, given the diversity of the risks at play, we have developed a systematic approach and procedures based on the simulation of various market assumptions including extreme cases such as a stock market crash. We have thus been able to check that, even in extreme situations, the degree of risk remains acceptable for the Group. As such, risk management is an integral part of our derivatives activity.

18.     In a press release dated February 16, 2006, SocGen announced that 2005 results were "up sharply." The release touted "[s]trong organic growth in revenues: +14.8% vs. 2004," "[v]ery low cost of risk: 16 bp," and a "[v]ery strong fourth quarter 2005." The press release also stated that the "credit risk environment remained favourable," enabling write-backs in provisions for this risk, and that "[m]arket risk was lower."

19.     On March 9, 2006, SocGen filed its 2006 Registration Document with the AMF (French securities regulator). Among other things, the 2006 Registration Document assured investors that SocGen engages in daily analysis "of the exposure and risks incurred by all the Group's market activities and comparison of these exposure [sic] and risks with the limits set," "constant analysis of exposure and results," and "daily limit monitoring for each activity, and constant checking that appropriate limits have been set for each activity."

20.     The 2006 Registration Document also contained a "Report of the Chairman on Internal Control Procedures," which noted that "internal control is part of a strict regulatory framework applicable to all banking establishments and Group staff," that risk management

procedures were defined at SocGen's highest management level, and that 1,900 staff were dedicated to reviewing and controlling risk exposures on a permanent basis. The 2006 Registration Document also claimed that teams of independent risk controllers "carry out daily reviews of all positions and risks taken in the course of the Group's market activities," that any cases where limits have been exceeded were highlighted, that market parameters used to calculate risks and results were verified each day, that precise methods have been defined for evaluating risks, and that controls were further reinforced through targeted action plans. Investors were also assured that compliance was regularly monitored by SocGen's compliance department and legal and tax departments, and that inspections were carried out by the Internal Audit Department and General Inspection Department.

21.    Bouton signed a "Certification of the Person Responsible for the Registration Document," stating that he certified that the information in the 2006 Registration Document was, "to the best of [his] knowledge, true and there are no omissions that could impair its meaning."

22.    On May 18, 2006, defendants announced SocGen's first quarter 2006 results, in a press release entitled "Excellent first quarter 2006." The release reported "[s]trong organic growth: revenues up +18.2% vs. Q1 05," "[v]ery low cost of risk: 25 bp," "Group net income: EUR 1,471m (+20.0% vs. Q1 05)," and "Group ROE after tax: 30.2%."

23.    In his quarterly letter to shareholders, published on SocGen's web site in June 2006, Bouton stated:

> For the tenth quarter in a row, the Group's risk expense remained very low as a result of an ever-buoyant credit environment and the different measures taken by the Group: diversification of its portfolio of businesses and improvement of its risk management and hedging techniques.

24.    On August 3, 2006, defendants issued a press release entitled "Excellent second quarter 2006." The release reported "[v]ery strong organic growth: revenues up 26.6% vs. Q2 05," "[c]ost of risk remains low: 21 bp," "[n]et income: EUR 1,320m (+37.9% vs. Q2 05)," "Group ROE

after tax: 25.7%," and "[f]irst half results up sharply."  The release stated that against a mixed but overall favorable financial and economic environment for SocGen's business, "the Group reported very good performances over the quarter, posting gross operating income of EUR 2,220 million, up 40.0% on Q2 05, and net income of EUR 1,320 million, up by a substantial 37.9%."

25.    The August 3, 2006 release also stated:

> The credit risk environment remained very favourable, enabling the division to make a net provision reversal of EUR 35 million in the quarter (provision reversal of EUR 54 million in H1 06). Few new loans required provisioning and the business was able to reverse some of its specific provisions thanks to an improvement in its counterparties' financial positions, or following the sale or repayment of the corresponding loans under the policy of active management of the credit portfolio. During the second quarter, the division actively continued its policy of using credit derivatives for hedging: over the first half, the CDO and CDS hedging portfolio increased by EUR 13.6 billion to EUR 22.1 billion at the end of June 2006.

26.    On November 9, 2006, defendants issued SocGen's third quarter 2006 press release, which stated: "Increase in revenues: +7.1% vs. Q3 05," "[c]ost of risk remains low: 21 bp," "[n]et income: EUR 1,272 million (+12.4% vs. Q3 05)," and "Group ROE after tax: 23.6%."  The release stated that against a backdrop of a mixed but overall favorable economic and financial environment, "the Group reported higher levels of activity than in the third quarter of 2005, which was already a strong comparative base: gross operating income was EUR 2,049 million for the period, representing a rise of 8.7% on Q3 05, while net income amounted to EUR 1,272 million, up 12.4% on the previous year."

27.    On February 14, 2007, defendants issued a press release entitled "2006: Sharp increase in results," touting SocGen's 2006 financial results.  The press release stated: "Strong organic growth in revenues: +15.7% vs. 2005," "[c]ost of risk low: 25 bp," "Group net income: EUR 5,221 M (+18.6% vs. 2005)," "Group ROE after tax: 25.8%," "[e]arnings per share EUR 12.33 (+15.2% vs. 2005)," and "[r]ecommended dividend: EUR 5.20 (+16.3% vs. 2005)."  The release also touted SocGen's "improved risk management techniques and hedging of high-risk exposure."

- 7 -

28.    The February 14, 2007 press release also stated:

Société Générale Asset Management (SG AM) has a complete, high quality offering and its innovative capability is recognised by the market. In 2006, SG AM confirmed its positioning . . . as the leading player in the CDO market with TCW (the number one player in cash CDOs) and SG AM Al (number 2 worldwide in synthetic CDOs).

29.    On March 16, 2007, the Individual Defendants caused the Company to issue its 2007 Registration Document, signed by defendant Bouton.

(a)    The 2007 Registration Document discussed SocGen's risk management, stating:

- Given the diversity and ongoing evolution of its activities, the Group is exposed to a wide range of risks, which are generally grouped into four categories:

*        *        *

- market risk: risk of loss resulting from changes in market prices and interest rates and in the correlation between these elements and their volatility . . . .

*        *        *

Risk management procedures are defined at the highest management level

The Group organizes a monthly Risk Committee meeting, chaired by the General Management, at which the Executive Committee defines the framework required to manage risk, reviews changes in the characteristics and risks of Group portfolios, and decides on any necessary strategic changes. The Group also has a Major Risks Committee, which focuses on reviewing areas of substantial risk exposure (on individual counterparties or segments of a portfolio).

*        *        *

Lastly, the procedures for managing, preventing and evaluating risks are regularly analyzed in-depth by the Board of Directors and, in particular, its Audit Committee.

(b)    The 2007 Registration Document further discussed the Company's Risk Division:

- An independent Risk Division, responsible for implementing an effective system of risk management and for ensuring risks are monitored in a coherent fashion across the Group

The Risk Division is completely separate from the business entities and reports directly to the General Management. Its role is to contribute to the development and profitability of the Group by guaranteeing a robust and efficient framework of risk management and overseeing all transactions carried out within its businesses.

Accordingly, the Group Risk Division is responsible for identifying all risks borne by the Group, defining and validating the methods and procedures for analyzing, measuring, approving and monitoring risks, ensuring risk information systems are adequate, managing risk portfolios, monitoring cross-disciplinary risks and anticipating levels of risk provisioning for the Group. Furthermore, it also assists in the appraisal of risks incurred on transactions proposed by the Group's sales managers.

- Procedures and organization

Based on the monitoring framework defined by the Risk Committee, a set of specific procedures has been compiled for each type of risk.

\*        \*        \*

Procedures for market risk:

- based on the Risk Division's recommendations, the Group Risk Committee defines limits for each type of activity which are then submitted for approval to the Board of Directors;

- teams of risk controllers who are completely independent from the front-office staff, carry out daily reviews of all positions and risks taken in the course of the Group's market activities;

- daily summaries of risk exposure are produced, highlighting any cases where limits have been exceeded;

- the market parameters used to calculate risks and results are verified each day;

- precise methods have been defined for evaluating risks, and the Risk Division must validate the valuation models used to calculate risks, results and provisioning levels.

These procedures and structures are progressively adapted to accommodate changes in regulations and the rapid growth of increasingly sophisticated businesses. Some controls are further reinforced through targeted action plans.

(c)    The 2007 Registration Document also discussed SocGen's compliance control systems:

- The permanent supervision of activities at a local level by operational staff forms the cornerstone of ongoing control within Société Générale Group

   This comprises all procedures implemented on a permanent basis to guarantee that transactions carried out at an operational level are correctly handled, secure and valid. The first level of responsibility for ongoing control lies with the operational staff.

Permanent supervision comprises two elements:

- day-to-day security: all operational staff are required to permanently comply with the applicable rules and procedures governing all transactions carried out;

- formal supervision: management is required to make regular checks using written procedures to verify that staff are complying with the rules and procedures for processing transactions and for ensuring effective day-to-day security.

   In order to ensure this system functions correctly . . . permanent supervision procedures are adapted for each Group entity according to their specific activities.

30.    The 2007 Registration Document described the Company's Internal Audit Departments:

   Each Internal Audit Department regularly identifies the areas of risk to which its division is exposed. It then defines an annual schedule of audits to make sure that the exposure is covered in full. Entities within the Group's Retail Banking Network, for example, are audited every 17 months, whilst in the Corporate and Investment Banking Division, highest-risk entities are audited around once a year.

   In the course of their assignments, the auditors carry out controls to check the security, compliance and efficiency of the division's activities, and evaluate the quality of the permanent supervision system in place. They then put forward recommendations based on their findings, and follow these up to check they are implemented correctly. Any problems noted or recommendations put forward are entered into the recommendation monitoring system managed by the Audit Departments and General Inspection.

31.    The 2007 Registration Document also discussed internal controls governing accounting and financial data, stating:

- 10 -

Accounting data are compiled by the back and middle offices and independently from the sales teams, thereby guaranteeing that information is both reliable and objective. These teams carry out a series of controls defined by Group procedures on the financial and accounting data:

- daily verification of the economic reality of the reported information;

- reconciliation, within the specified deadlines, of accounting and management data using specific procedures;

- production of a quarterly analytical report on the supervision carried out, which is submitted to the management of the entity or division, and to the Group Finance Department.

Given the increasing complexity of the Group's financial activities and organizations, staff training and IT tools are reviewed on a permanent basis to check that the production and verification of financial and management accounting data are effective and reliable.

32.    At its meeting on May 10, 2007, the Board of Directors of SocGen approved the results of the first quarter of 2007.  Its release, entitled "First quarter 2007: solid performances against a high first quarter 2006," reported net banking income for Corporate and Investment Banking of €1,947 million and stated in part:

The Group's cost of risk was once again low (26 bp of risk-weighted assets), due to both a continued favourable credit environment and factors specific to the Group: a policy of diversification of the businesses portfolio, improved risk management techniques and hedging of high-risk exposure.

33.    On August 2, 2007, the Company issued a release entitled "Strong growth in second quarter 2007," which stated in part:

At its meeting of August 1st 2007, the Board of Directors of Societe Generale approved the results for the second quarter of 2007. The Group posted a very good performance in Q2 07 on the back of revenue growth in all its core businesses, with gross operating income of EUR 2,805 million, up +26.4% on Q2 06. Net income totalled EUR 1,744 million, up +32.7% on Q2 06.

*    *    *

The Group's cost of risk remained low (25 bp of risk-weighted assets) due to both a still favourable credit environment and factors specific to the Group: a policy

- 11 -

of diversification of the businesses portfolio, improved risk management techniques and hedging of high-risk exposure.

\*       \*       \*

Corporate and Investment Banking's net banking income for the second quarter of 2007 amounted to EUR 2,077 million, up +16.7% (+16.9 % in absolute terms) vs. Q2 06. NBI for the first half of 2007 came to EUR 4,024 million, an increase of +10.9% (+10.1% in absolute terms) vs. a H1 2006 which represented a high comparison base. This performance confirms the success of SG CIB's profitable growth strategy focusing on its three key areas of expertise (derivatives, structured products and euro capital markets). SG CIB continues to make targeted investments in markets offering real and stable potential and allowing it to rapidly capitalise on its areas of expertise (for example, SG CIB has rapidly established itself as one of the leaders in warrants in Korea).

The Equities business enjoyed an excellent quarter, with NBI up +35.4% vs. Q2 06 (+37.9% in absolute terms) at EUR 1,044 million. NBI for the first half of 2007 came to EUR 2,112 million, up +18.1% vs. H1 06 (+18.3% in absolute terms). Commercial performances were excellent, especially for the sale of structured products in France and abroad.

(Footnote omitted.)

34.    On November 7, 2007, on the Company's third quarter 2007 earnings call, Frédéric Oudéa ("Oudéa"), the Company's CFO, made the following statements:

The solid resilient business model is based on, first of all, 63 diversified profit centers, which help reduce fluctuations in results and increase the matching of rates. Secondly, significant experience in market risk management based on the professionalism of its teams and recognized ability in recycling risks. The third quarter of 2007 was marked by excellent client-driven activity, with a 65.4% increase in revenues versus last year and 40% increase if we look at the first nine months compared with last year.

\*       \*       \*

Let's turn now to page 31 and look at the Fixed Income and Currencies & Commodities business. As I said here on the contrary, revenues are down sharply by 78.2% versus last year. In a market which was seriously affected by the financial crisis, the trading activities posted a negative contribution of €277 million. This performance was due mainly to a negative €213 million impact on the different positions exposed to the US residential mortgage sector.

We subjected all our activities exposed to US residential mortgages to stress test in order to measure the maximum potential losses at these activities. As we have

- 12 -

no retail banking activities in the US, our exposure is indirect via exposure to originators of subprime loan, RMBS securitization and CDO structuring and trading activity.

Valuation of illiquid position in CDOs were based on a model using forward-looking scenario of $196 billion cumulative loss for the whole industry in the US residential mortgage sector within the next three years. This scenario was applied to subprime, Alt-A and prime loans rented in the different vintages in 2006 and 2007 and then, again, applied also in a gradually reduced rate to produce generation of loans.

For example, let me just give you a few of the figures that we took to build this scenario. For 2006 subprime loans production, the cumulative probability of loss is 14.6% that results from a 30% probability of default and a 49% loss given default.

Regarding our small RMBS portfolio, it was marked down based on observable data and will be valued on that basis going forward. Overall that said we came out with €230 million write-down, which was booked in the NBI. There is a site in our supplementary data detailing our exposure to US residential mortgage risk, as well as our stress test assumptions.

35.    Emphasizing how "conservative" SocGen's accounting was and stating that its markdowns of 5% had probably been "too prudent," SocGen and Oudéa made the following statements during the November 7, 2007 question and answer session:

[KIMON KALAMBOUSSIS]:  Hi. This is Kimon Kalamboussis from Citi. Two questions, if I may. First on the provisions, could you tell us how the €230 million write-down is split between RMBS and CDO split? And also, how is the LBO write-down rate of 5% calculated, please? Second question is on Rosbank actually, could you update us on the case and when you plan to exercise the option? And also would you have to bid for the minorities, please? Thanks.

[OUDÉA]:  I'll answer your question on Rosbank, but first turn to Jean-Pierre Mustier to perhaps answer your first question on the 230 million and the LBO provision. Jean-Pierre?

[MUSTIER]:   Yeah. We don't give the split between the values – components of our write-down basically on our US residential mortgage exposure, which are disclosed on page 57 of the presentation. On the LBO side, we took a present markdown of 5%, which we consider is probably too prudent in the sense that we feel that at this stage a certain number of the loans we are underwriting likely to syndicate at a better level. But we felt as for US residential mortgage that we want it to be on the safe side for all the markdown we were taking our books.

*       *       *

- 13 -

[JEAN PIERRE LAMBERT]:  Thank you very much. Can I have a follow-up question? If the CDS has been structured in 2005 and why are they still in your portfolio? Is it because using the valuable assets or is it because it's difficult for you to place them in the market? What is the explanation for the presence of those CDOs?

[MUSTIER]:  I am not always in the mind of our creditors, but usually when we keep assets on our books, it's because we feel there is value in the books basically. So these assets have risk profile at this stage the 2005 mezzanine CDOs, as I said, are under our conservative stress scenario, are very likely impacted by the stress. So in a way we feel they are good assets. Another issue is that we have to clarify one thing and the difference of what US banks could release in their 10-Q, we have released here all our exposure risk on our US residential mortgage on CDOs we have structured and CDOs on which we have participated but not structured. So the parameter basically could be potentially wider. And on the CDOs here, we were participant but not structured on the mez '05 and mez '06 and we were the structure on the A grade.

36.    On November 7, 2007, the Company issued a release entitled "Third quarter 2007:

Good resilience of Q3 07 results."  The release stated in part:

At its meeting of November 6th 2007, the Board of Directors of Société Générale approved the results for the third quarter of 2007. Group net income totalled EUR 1,123 million, down -11.5% on Q3 06 and ROE after tax came to 18.0% (vs. 24.6% in Q3 06). For the first 9 months, the Group posted an increase in its results (Group net income of EUR 4,298 million, or +6.3% vs. 9M 06) and a high level of profitability (ROE after tax 23.8% for 9M 07 vs. 27.5% for 9M 06).

\*        \*        \*

Corporate and Investment Banking's net banking income amounted to EUR 1,159 million in Q3 07 (-22.3% vs. Q3 06, -23.6% in absolute terms), in a very unfavourable market environment. NBI for 9M 07 came to EUR 5,183 million, up +1.9% (+0.2% in absolute terms) vs. 9M 06, with client-driven revenues increasing +18.4% over the same period.

The good third quarter performance of Equities activities, which represent a significant proportion of the division's revenues (44% in 2006 and more than 50% in H1 07), helped limit the effects of the crisis. Commercial performances were good in all the businesses (client-driven NBI +21.1% vs. Q3 06). The NBI of trading activities came to EUR -180 million in Q3 07, with negative NBI for Fixed Income, Currencies and Commodities trading activities, which were directly impacted by the financial crisis, and a positive contribution for Equities activities.

The NBI of the Equities business was up +13.4% (+11.5% in absolute terms) at EUR 679 million in Q3 07 vs. Q3 06. NBI for 9M 07 amounted to EUR 2,791

million, up +18.4% (+16.6% in absolute terms) vs. 9M 06. The business line produced good third quarter performances in all its client-driven activities, where revenues were up +65.4% vs. Q3 06: flow products rose +67% in Q3 07 vs. Q3 06; revenues generated from the sale of structured products were 67% higher than in Q3 06 and revenues from cash equities were 52% higher. Despite an adverse market environment, Lyxor recorded positive net inflows in Q3 07 (EUR +530 million).

(Footnote omitted.)

## DEFENDANTS' STATEMENTS WERE FALSE

37.     The true facts which were then known to and/or recklessly disregarded by the defendants include:

(a)     SocGen's market risk management was virtually non-existent.  Kerviel's trades alone exposed the Company to €50 billion ($73.5 billion) in market risk, more than the entire market capitalization of SocGen.  Any institution where a single trader can bet the company on movements in the market can not reasonably be said to manage market risk.

(b)     The Company's internal controls were inadequate.  In fact, SocGen received at least 75 internal alerts concerning improprieties and inaccuracies in Kerviel's reported trades as well as inquiries from Euronext.  Further, SocGen knew that Kerviel had failed to take a required vacation – which would have permitted other traders to review his transactions – but failed to take any action.  Thus, contrary to defendants' statements, SocGen's internal controls were lax and ineffective.

(c)     SocGen's publicly reported financial results were inaccurate because they failed to reflect the gains and losses from Kerviel's trades.  In the first quarter of 2007, SocGen failed to report €22,577,407 in P&L (gross earnings before taxes and charges) gained from Kerviel's trades.  In the second quarter of 2007, SocGen failed to report €137,666,448 in P&L losses resulting from his trades.  In the fourth quarter of 2007, SocGen failed to report €442,295,715 in P&L gained from Kerviel's trades.

(d)    SocGen had suffered €2.6 billion in losses due to U.S. mortgage-related exposures, which losses defendants attempted to obfuscate when they attempted to use "the Kerviel fiasco" as a smokescreen to distract investors from these huge write-offs by announcing both losses at the same time.

### THE TRUTH BEGINS TO COME TO LIGHT

38.    On January 24, 2008, before the market opened, the Company issued a press release which stated in part:

> Société Générale Group has uncovered an exceptional fraud in a sub-section of its market activities.
>
> The Group expects its net income for 2007 to be in the range of Euro 0.6-0.8bn, including the loss resulting from this fraud and additional US residential mortgage and monoline related write-downs.  The Group intends to pay a dividend for 2007 in line with its pay-out ratio target of 45%.
>
> As a result of this fraud and in order to strengthen its capital base, the Group will launch a capital increase of Euro 5.5bn which has been fully underwritten.
>
> Losses on a fraudulent and concealed position
>
> Société Générale Group (the "Group") has uncovered a fraud, exceptional in its size and nature; one trader, responsible for plain vanilla futures hedging on European equity market indices, had taken massive fraudulent directional positions in 2007 and 2008 beyond his limited authority.
>
> Aided by his in-depth knowledge of the control procedures resulting from his former employment in the middle-office, he managed to conceal these positions through a scheme of elaborate fictitious transactions.
>
> There is no residual exposure in relation to these positions, which were discovered and investigated on January 19th and 20th, 2008.  It was decided to close these positions as quickly as practicable in the best interest of market integrity and the Group's shareholders.  Given the combination of the size of the positions and the very unfavourable market conditions encountered, this fraud has a negative impact of Euro 4.9bn that the Group has decided to recognise in its 2007 pre-tax income.
>
> The trader's positions have been reviewed and a thorough analysis of all his department's positions confirmed the isolated and exceptional nature of this fraud. The employee who has confessed to the fraud has been suspended and a dismissal procedure has been initiated.  The individuals in charge of his supervision will leave the Group.

Additional write-downs in relation to US RMBS CDOs and monoline insurers

The Group will post additional write-downs of Euro 2.05bn in Q4 07, comprising the following:

– Euro 1.1bn in relation to US residential mortgage risk;

– Euro 550mm in relation to exposure to US monoline insurers; and

– Euro 400mm unallocated additional provision in relation to the above-mentioned exposures.

US residential mortgage exposure

The Group's exposure to US residential mortgage risk mainly consists of portfolio of unhedged super senior CDO tranches of RMBS. In light of the worsening of the US residential mortgage crisis, the Group will apply new write-downs of Euro 1.1bn in Q4 07, consistent with the valuation levels of the ABX indices where they exist (see detailed assumptions and outcome in Appendices 1 to 3). The consistency of the modelling and the parameters has been reviewed by the Group's auditors. The subprime RMBS portfolio (Euro 550mm as of September 30th, 2007), which is valued directly on the basis of market parameters, has been hedged, amortised or sold. As of end 2007, residual exposure stood at around Euro 35mm.

Exposure to US monoline insurers

Other assets on the Group's balance sheet benefit from credit enhancements supplied by monoline insurers. Applying the same stress test methodology to the underlying portfolio as to the assets underlying the unhedged CDO portfolios, the Group will book a write-down of Euro 500mm in Q4 07 (see Appendix 4). In addition, a write-down of Euro 50mm has been taken to eliminate the whole of its ACA-related exposure.

39.     As a result of these disclosures, artificial inflation was removed from the price of

SocGen securities, with shares of SocGen stock declining from $107.76 to $104.55 in one day.

40.     On January 26, 2008, more details of defendants' misconduct were revealed.

(a)     In an article entitled "Socked, not gently," *The Economist* stated:

[M]arket-watchers expressed disbelief that such huge positions, in instruments that the bank itself described as "plain vanilla," could have been built unnoticed.

(b)     *The Wall Street Journal* published an article entitled "Société Générale's Damage Control – After Alleged Fraud, French Bank Strives To Save Reputation." The article stated in part:

> Paris prosecutors have launched a preliminary criminal investigation into Mr. Kerviel's actions, though no charges have been pressed. Shareholders also have launched a complaint with Paris prosecutors.

41.     On January 28, 2008, the press continued to cover SocGen with stories about the magnitude of defendants' fraud:

(a)     *The Financial Times (London)* published an article entitled "Kerviel is just part of a global rogues' gallery," which stated in part:

> In addition, the bad news from SocGen last Thursday was not limited to Mr. Kerviel. The same press release that blamed "one trader" for a Euros 4.9bn loss disclosed another risk management failure: write-downs of Euros 2.05bn related to "unhedged super senior CDO (collateralised debt obligation) tranches" and other subprime-related derivatives. A proper ranking of the losses SocGen announced would go: first, trading losses by management; second, CDOs; third, Mr. Kerviel. The leading rogue trader in history was a distant third on SocGen's list of bad news that day.

(b)     *The Globe and Mail* published an article entitled "Exchange says it questioned Kerviel's actions," which stated in part:

> Société Générale SA struggled Monday to defend its stated assertion that Jérôme Kerviel, the young trader the French banking giant accuses of massive fraud, acted entirely undetected for almost a year as his trading positions climbed to tens of billions of euros.
>
> French investigators said Eurex, the European futures and options exchange, questioned trades by Mr. Kerviel, 31, in November. . . .
>
> "In November, 2007, Eurex said it was worried about a particular position that had been taken," said Jean-Claude Marin of the Paris prosecutor's office.

42.     Between January 29 and January 31, 2008, several articles discussing the SocGen scandal were published:

(a)     *The Financial Times (London)* published an article entitled "Kerviel 'invented contracts in quest for bonus.'"   The article stated in part:

> Jérôme Kerviel, the trader at the centre of the Société Générale scandal, had previously been the subject of internal investigations in his department, French investigators said yesterday.

*     *     *

> Prosecutors also revealed that Eurex, one of the derivatives exchanges on which Mr. Kerviel had traded, had flagged concerns about his activities last November.

*     *     *

> Mr. Kerviel has admitted to acting alone but claimed the practice of making trades for which he did not have permission was widespread.

> "He said that, although his positions were large, other traders were acting on a smaller level," the prosecutor said.  "He thinks that, for a long time, he generated profit and that he was tolerated to a certain extent."

(b)     *The Guardian (London)* published an article entitled "Eurex exchange told SocGen about rogue trader in November: Bank admits it was warned on more than one occasion: Shareholders go to court over alleged insider dealing."   The article stated in part:

> SocGen faces intense criticism from its own shareholders. An enraged Colette Neuville, head of Adam, a minority shareholders' lobby, has asked the AMF, the French financial services authority, for a formal inquiry into alleged insider trading by a director and/or others at the bank.

> She also wants the AMF to investigate whether the bank deliberately misled investors about the scale of its sub-prime losses in November last year when it put them at euros 230m – only to announce a euros 2.05bn hit two months later.

> "It appears to me hard to explain that between November and January the scale of the losses was multiplied 10 times," she said. "There are strong possibilities that the information given to shareholders was incorrect, misleading."

*     *     *

> [Frederik-Karel] Canoy [a lawyer acting for shareholders] said he had also filed a separate complaint about the sale of 1m shares by a SocGen director, Robert Day, on January 9 and 10, disclosed in AMF filings. The American, a former asset

- 19 -

management director, sold shares worth euros 85.7m in his own name while two foundations "linked" to him cashed in euros 8.63m and euros 959,066 respectively.

(c)     *The New York Times* published an article entitled "French Inquiry: Bank's Inaction Grows as Issue," which stated in part:

The credibility of Société Générale's management came under fresh scrutiny Monday after Jérôme Kerviel told French prosecutors that his fictitious trading started as far back as 2005 – a year earlier than the bank had acknowledged.

(d)     *The Wall Street Journal* published an article entitled "The Fallout at Société Générale: Tasks Mount for a Point Man – Explaining Scandal Is Latest Challenge On Mustier's Plate."  The article stated in part:

Even before the trading scandal, the bank was preparing to detail fresh losses on mortgage-related investments.  For the fourth quarter, in a report overshadowed by the 4.8 billion euros trading loss, Société Générale said it would take 2.05 billion euros in write-downs, up from only 230 million euros in the third quarter.  More could be coming: In a recent report, Citigroup bank analyst Kimon Kalamboussis estimated that Société Générale might have to take an additional markdown of 1.5 billion euros.

(e)     *The Los Angeles Times* published an article entitled "Trader at bank quelled suspicion, officials say; Société Générale was warned of risky bets by Jérôme Kerviel."  The article stated in part:

Executives at French bank Société Générale were warned about risky bets being made by rogue trader Jérôme Kerviel two months ago . . . authorities said Monday.

Internal bank audits also flagged Kerviel's actions, "but each time he managed to explain them," prosecutor Jean Claude Marin said. Kerviel, he added, thought bank officials didn't probe too deeply because he was pulling in profits for the financial institution.

\*     \*     \*

Also Monday, a group of bank shareholders filed a suit accusing Robert A. Day – founder of Los Angeles-based Trust Co. of the West – of insider trading in connection with $126 million in stock sales Jan. 9 and 10, before Kerviel's trades were exposed.

Day, who became a Société Générale director after the French company bought TCW in 2001, denied the accusation through a spokesman.

(f)     *Business Week* published an article entitled "SocGen Had Been Warned About

Kerviel," which stated in part:

Shares in Société Générale swooned nearly 4% in Paris trading on Jan. 28, to [€]71 [$104.35], as speculation mounted over a possible breakup of the battered French bank, while the Paris prosecutor cited evidence that SocGen had received multiple warnings about unauthorized transactions by rogue trader [Jérôme] Kerviel that ultimately cost the bank $7.1 billion [BusinessWeek.com, 1/24/08].

Prosecutor Jean-Claude Marin, who announced the filing of attempted-fraud charges against Kerviel, told reporters the derivatives exchange Eurex had alerted SocGen last November about questionable trades by Kerviel. Separately, several of the bank's internal control units also had flagged some of his trades in recent months, Marin said.

*     *     *

In its most detailed public explanation of the scandal to date, SocGen acknowledged on Jan. 27 that the trading positions taken by Kerviel had reached more than $73 billion, far exceeding the bank's roughly $50 billion market capitalization, by the time the bank learned of the problem over the weekend of Jan. 19-20. The bank said Kerviel took advantage of his knowledge of the bank's internal control systems, gained during his five years in back-office jobs.

The bank's explanation, however, didn't mention the warning flags raised earlier. According to prosecutor Marin, SocGen's middle office, accounting department, and risk department had raised questions about Kerviel's trades in recent months, as had Eurex, the derivatives exchange operated jointly by Deutsche [Börse] and the SWX Swiss Exchange stock markets.

(g)     *The Financial Times (London)* published an article entitled "Watchdog probes

share deals," which stated in part:

The AMF, the French financial watchdog, on Tuesday said it had launched an investigation into share dealings in Société Générale.

It emerged on Monday night that Robert Day, one of the richest men in the US and a member of SocGen's board since 2002, had sold Euros 140m [$206m] worth of SocGen shares in the two weeks before it announced Euros 7bn of exceptional losses.

*     *     *

- 21 -

Mr. Day and his foundation sold Euros 45.02m of shares on January 18 – two days before the SocGen board met to discuss a Euros 2.05bn writedown on its exposure to US subprime mortgages and Euros 4.9bn of losses from the alleged rogue trader.

(h)    *The Financial Times (London)* published an article entitled "SocGen to call on

outside audit team for probe," which stated in part:

The SocieteGenerale board is set to call in independent auditors to examine events leading to the biggest rogue trading scandal in history, as directors seek to bolster Daniel Bouton, the increasingly vulnerable chairman, ahead of a crucial meeting today.

But the fate of Jean-Pierre Mustier, SocGen's star executive, was hanging in the balance ahead of the meeting, as the head of corporate and investment banking is set to be grilled on what he knew of an alarm raised by Eurex, Europe's top derivatives exchange, in November.

"Our previous assumptions have to be questioned," said a director. "If the Eurex warning is confirmed then there is a lot more responsibility in the organisation than we thought."

SocGen admitted it had received letters from Eurex at the end of last year questioning the strategy of Jérôme Kerviel, the 31-year-old trader now accused of exposing the bank to potentially fatal unauthorised futures positions.

(i)    *The Guardian (London)* published an article entitled "Kerviel's defence,"

which stated in part:

Jérôme Kerviel, the 31-year-old rogue trader, has accused his superiors at SocGen of deliberately "turning a blind eye" to his mammoth operations in equity derivatives trading and of being part of a culture of fear.

\*    \*    \*

"I can't believe that my superiors were unaware of the amounts I was committing, it's impossible to generate such profits with small positions," he told the police after giving himself up on Saturday.

He claimed to have made a "profit" of euros1.4bn (£1bn) by the end of 2007 but to have taken steps to conceal this and instead declare one of euros 55m in the hope of winning a euros 600,000 bonus. "As long as we are winning and that's not too obvious, that it fits in, one says nothing," he added.

Kerviel, who insisted his techniques of concealment were "not at all sophisticated" and should have been picked up by correct controls, sums up the bank's culture as "Not seen, not taken.  If taken, you're hanged."

(j)    *The New York Times* published an article entitled "Beyond Bank's $7 Billion

Loss, Fear of More," which stated in part:

Jérôme Kerviel's 4.8 billion euro trading loss ($7.1 billion) had a positive effect for Société Générale, at least temporarily.

"The news at SocGen may have masked their subprime losses," said Richard Batty, a fund manager at Standard Life Investments in Edinburgh, using financial-world shorthand for the bank.

The same day Société Générale said that Mr. Kerviel, a rogue trader, had cost it billions, it announced one of the largest subprime-related write-downs by a European bank. Société Générale, based in Paris, said it would write off 1.1 billion euros (now $1.62 billion) related to the United States housing market and 550 million euros ($813 million) related to American bond insurance companies. Only UBS has announced a larger write-down.

Mr. Kerviel's lawyers, Elisabeth Meyer and Christian Charrière-Bournazel, told Agence France-Presse that Société Générale aimed to "raise a smoke screen that would distract the public's attention from far more substantial losses that it had made in recent months, notably in the unbelievable subprime affair."

(k)    *The Financial Times (London)* published an article entitled "Esprit de corps

keeps workers loyal to SocGen," which stated in part:

[T]he banking establishment has voiced astonishment that warnings from Eurex, the German derivatives exchange, about suspicious trading activity by Mr. Kerviel last year had not led to the earlier discovery of his unauthorised positions.

Eurex wrote several letters to SocGen in late 2007 asking for information about the strategy behind Mr. Kerviel's transactions.  "In my firm, if we got a call from Eurex, there would be absolute hell to pay," says an executive in equities at a US competitor.

43.    On February 5, 2008, *The Globe and Mail* published an article entitled "U.S.

investigates SocGen stock sales," which stated in part:

The U.S. Department of Justice is looking into stock sales by a member of French bank Société Générale's board shortly before the bank announced billions of dollars in losses by a single trader, a source close to the investigation said yesterday.

"The U.S. Attorney for the Eastern District of New York is taking the lead," the source said, referring to the investigation of Robert Day, a board member of Société Générale and investment manager of U.S.-based Trust Co. of the West.

44.     Also on February 5, 2008, *The Wall Street Journal* published an article entitled "SEC Probes French Bank – U.S. Investigation Of SocGen Focuses On Stock Sales," which stated in part:

> The U.S. attorney in Brooklyn, New York, has also opened a criminal probe related to Société Générale, according to a person familiar with the matter, although its precise focus wasn't immediately clear.  A spokesman for Société Générale said the bank's New York branch was contacted by the U.S. Attorney's Office for the Eastern District of New York Jan. 25 regarding the trading losses announced Jan. 24.  The bank is cooperating fully with the investigation.

45.     On February 7, 2008, additional press coverage of the scandal was published:

(a)     *The Wall Street Journal*  published an article entitled "Tax Twist in the Trading Scandal," which stated in part:

> Société Générale says it lost 4.9 billion euros ($7.17 billion) at the hands of 31-year-old trader Jérôme Kerviel. Now, the embattled French bank could face another financial hit – this time from the tax man.
>
> As they pore over the trades, financial books and mobile-phone records of Mr. Kerviel, Société Générale officials have discovered that the trader booked a real gain for the bank of 1.4 billion euros by the end of last year, according to people close to the bank.
>
> That profit now "is subject to corporate tax," according to one person close to the bank. "We will argue against it, but fiscal authorities will want their share," this person said.
>
> *     *     *
>
> The discovery doesn't alter the bank's reported 4.9 billion euros net loss announced three weeks ago.  However, the realization that Société Générale was sitting on a 1.4 billion euros profit – enough to offset subsequent write-downs the bank announced for its exposure to U.S. subprime mortgages – and didn't notice is likely to raise further questions about the bank's internal control systems.
>
> Already, an internal bank committee, French prosecutors and the French Finance Ministry have been trying to figure out how Mr. Kerviel could engage in his risky trades for so long without being detected.

- 24 -

(b)    *The Financial Times (London)* published an article entitled "SEC investigates whether SocGen breached US securities laws," which stated in part:

> The US Securities and Exchange Commission is looking at whether Société Générale violated US securities laws as it unwound and revealed its Euros 4.9bn loss from Jérôme Kerviel's allegedly rogue derivatives trades, the Financial Times has learnt.

*    *    *

> News of the probe is another blow to SocGen's capital-raising plans. The bank's board met last night to decide the timing and terms of its emergency Euros 5.5bn capital increase, which could be launched as early as tomorrow. It is understood that when the capital increase is complete, Daniel Bouton, chairman, could decide to step down, according to people close to the situation.

(c)    *The Financial Times (London)* published another article, entitled "McCreevy condemns SocGen's 'abject' failure," which stated in part:

> Société Générale was accused last night of "abject carelessness" as European Union regulators delivered a scathing attack on the French bank's failure to prevent the biggest rogue trader scandal in financial history.

> Charlie McCreevy, the EU's internal market commissioner, said it was inexcusable that SocGen had not heeded warnings from Eurex, one of the world's leading derivatives exchanges, about transactions conducted by Jérôme Kerviel, the bank employee blamed for the scandal.

> Mr. McCreevy's remarks in a London speech amounted to the strongest public condemnation by any regulator of SocGen's behaviour in the affair, which cost the bank almost Euros 5bn ($7.3bn, £3,7bn) in net losses.

> He emphatically endorsed the opinion of risk control and fraud experts who have criticised SocGen's internal control systems, and he said it underlined the need "to reinforce the supervision of major cross-border banking groups and financial conglomerates" in the EU.

*    *    *

> "As far as treasury and proprietary trading risk is concerned, it seems to me amazing that, despite all the lessons about controls that should have been learnt from a sequence of multi-billion dollar losses clocked up by rogue traders in several financial institutions around the world over the past decade, a top-class institution has once again been exposed as having fundamental control weaknesses," Mr. McCreevy said. "It is inexcusable that the entire market value of a financial institution can be placed at risk by such abject carelessness on the part of a leading

- 25 -

European bank, that that institution failed to heed the warnings of a significant market counter-party and failed to learn the lessons that rogue traders have taught us about the checks, balances and controls that must be in place for risk to be effectively managed and controlled."

The commissioner was referring to warnings that SocGen received from Eurex last November about Mr Kerviel's activities and which the bank brushed aside.

(d)    *The Daily Telegraph (London)* published an article entitled "SocGen days

from rights issue," which stated in part:

Mr. Bouton suffered a further blow yesterday as a former inspector of trading operation from 2001 to 2004, Maxime Legrand, detailed the weak controls.  He told Agence-France Presse: "Since inspectors do not have enough power in the bank, we are not given the time we need, or the means to check things out.  We pretend to have an inspection to please the banking commission.  That's where the hypocrisy lies with management: everyone knows about this."

(e)    *The Australian* published an article entitled "French trader 'carried away,'"

which stated in part:

Jerome Kerviel lost $8 billion but claims his employer made him a scapegoat.

*        *        *

Jérôme Kerviel, 31, accepted that he had made mistakes but said that he had been turned into a scapegoat by his employer, Société Générale.

In his first interview since he was placed under investigation in connection with the biggest rogue trader scandal in history, Mr Kerviel sought to offload blame on to the bank itself.

"I assume my share of responsibility, but I will not be the Société Générale's scapegoat," he said.

46.    On February 8, 2008, *The Financial Times (London)* published an article entitled

"How Kerviel's bets exposed lax controls at Société Générale," which stated in part:

Moreover, it has become clear that Mr Kerviel's managers ignored multiple warning signs that, if heeded, would have allowed them to stop the young trader long before he was able to do so much damage.

*        *        *

- 26 -

However, rival executives say Mr Kerviel's ability to avoid detection for years suggests several glaring shortcomings in SocGen's controls. For example, the bank was not monitoring the gross trading positions he was taking but looking only at his net exposure, which he manipulated through fake hedging contracts. Mr Kerviel's technique of regularly cancelling trades, or claiming to have made a mistake when challenged, should have alerted his superiors that something strange was going on. SocGen also admits it did not change its computer passwords regularly, as standard industry practice requires.

\*       \*       \*

But financial success, and the pressure to keep performing, combined to produce an arrogant culture. Maxine Legrand, a former trading floor inspector who left the bank in 2004, this week complained to Agence France-Presse that SocGen's risk controls were weak, traders were not punished for breaking rules and the inspection team was treated with disdain on the trading floor. SocGen dismisses his claims. Another former SocGen employee, who left the bank in 2002 after doing work experience for a year, says a "lack of controls" allowed him to work on a big debt syndication that lost the bank several hundred thousand euros through a basic mistake. "In French banks there is much less control and more risk-taking than Anglo-Saxon firms," says the trader, who now works for a mid-sized European brokerage.

Mr Kerviel's own testimony suggests his activities were founded on some fairly basic methods to fool his superiors. He created false e-mails by reproducing the format and header of e-mails he had received from clients, to rebuff any questions from the bank's internal controls team. "The techniques I used later were not at all sophisticated, in my view: any correctly carried out control is bound to have uncovered these operations. There was nothing Machiavellian about my behaviour," he told police.

By last July – when the US subprime mortgage crisis was deepening – Mr Kerviel's unauthorised short-selling strategy was proving very profitable. He was sitting on $500m profit, about which he admits he started feeling intimidated: "I cannot believe my superiors did not know the amounts I was investing, as it is impossible to make these kinds of profits with small positions." But he was not caught for several more months.

Apart from deficiencies in its own controls, SocGen missed external warning signs about Mr Kerviel. Last March France's banking commission, after a series of inspections, twice wrote to Mr Bouton about the need to reinforce SocGen's controls, particularly in the equity derivatives team where Mr Kerviel worked. Then, on November 7, a surveillance officer at Eurex, the derivatives exchange, e-mailed SocGen questioning Mr Kerviel's purchase of 1,700 Eurostoxx futures and 2,000 Dax futures.

\*       \*       \*

- 27 -

Later that month, when SocGen's human resources department alerted Mr Kerviel's boss that he had not been on holiday for eight months except for four days in August, he was asked to take some leave. But Mr Kerviel told them December was the anniversary of his father's death and he did not want to be alone, persuading his boss that he could wait until January. "With hindsight, this was a mistake," admits Mr Martineau. Most investment banks require traders to take at least two consecutive weeks' holiday a year, which limits the scope for concealing their positions.

\*        \*        \*

After consulting with regulators Mr Bouton decided to close the Euros 50bn position built up by Mr Kerviel as quickly as possible. It took one of the bank's top traders three days to do so.

Before European markets opened on Monday, shares were falling sharply across Asia in reaction to worries about the stability of monoline bond insurers, which could trigger more big losses for the financial sector. That day, stock markets suffered their worst fall since September 11, 2001.

"I was in front of my trading screen that morning and could not believe what was happening," says Erick Tripoli, proprietary trading manager at Van der Moolen, the Dutch market maker. "It was horrible. Someone was selling a massive position by volume, not by price. When we heard it was SocGen, we just laughed, as no trader would do such a bad job."

Mr Kerviel told police his positions had still been profitable before markets closed that Friday, his final day of trading. He had switched his strategy since the start of the year to taking long positions – betting on a rise in stock markets – as he was "convinced the market was at a low point and would rebound."

However, SocGen says his positions by that stage were Euros 2.7bn in the red. By selling those positions into a falling market, the losses rose to Euros 6.3bn. But when it reported the loss, SocGen subtracted the Euros 1.4bn profit Mr Kerviel had made in 2007 – even though it subsequently claimed his unauthorised trading had made only a "small profit" that year.

47.        On February 9, 2008, *The New York Times* published an article entitled "2nd Trader Emerges in Inquiry in France," which stated in part:

French investigators said Friday that they were questioning a second trader in connection with Société Générale's 5 billion euro ($7.1 billion) loss, the worst in history caused by a rogue trader.

\*        \*        \*

Legal experts said the revelation that Mr. Kerviel might not have been the lone operator suggested that oversight of Société Générale's trading room might have

- 28 -

been recklessly lax. That could put added pressure on Daniel Bouton, the bank's chief executive, and other top managers to explain more fully the circumstances that led to the losses.

"It really suggests a higher-level failure of risk management than we thought two weeks ago," when the bank initially disclosed its trading losses, said Christopher Mesnooh, an international business lawyer in Paris.

"It's one thing to overlook one person," he added, "but if it's two people then it begins to stagger the imagination."

48.    On February 11, 2008, *The Financial Times (London)* published an article entitled

"SocGen is accused of complicity by Kerviel lawyer," which stated in part:

The lawyer for Jérôme Kerviel – the man who allegedly masterminded the biggest rogue trading fraud in financial history – yesterday accused his employer, Société Générale, of complicity in the scandal that has cost the bank €4.9bn ($7.1bn).

"The question we ask is can we really speak of fraud when it seems that everyone knew what Jérôme was doing?" said Guillaume Selnet. He insisted there was "no Jérôme Kerviel organisation. He is not at the head of some network," implying that Mr Kerviel had worked alone but suggesting complicity on the bank's part because it was aware of his trades.

49.    On February 11, 2008, *The Financial Times (London)* published an article entitled

"Internal threats need to become a security priority," which stated in part:

The staggering Euros 4.9bn loss incurred by a rogue trader at Societe Generale has repercussions that extend far beyond the rarefied world of derivatives trading – notably concerning IT security issues that affect many organisations.

Richard Stiennon, an IT security consultant, says: "The SocGen case is a classic internal one, carried out by a knowledgeable insider and, technically, it would have been very easy to detect."

*        *        *

As Mr Kerviel told the police himself: "The techniques I used were not at all sophisticated, and in my opinion, any correctly conducted control should have been able to detect these operations."

50.    On February 12, 2008, *BusinessWeek Online* published an article entitled "SocGen

Sinks on Stock Issue, Writedown: The bank's Feb. 11 announcement reveals another drop thanks to

the rogue trading a scandal and subprime-related losses." The article stated in part:

Société Générale's already-battered shares fell more than 4% in Paris trading on Feb. 11, to [€]74.59 [$108.22] a share, after the bank announced a heavily discounted $8 billion capital increase to help offset losses from a rogue trading scandal and bad U.S. real estate investments. SocGen shares have fallen nearly 50% over the past year but had risen slightly since the scandal was disclosed Jan. 24 on speculation the bank could be a takeover target.

"We offered attractive terms in a volatile market," SocGen Chief Financial Officer Frédéric Oudea said in a conference call, explaining why existing stockholders will be able to buy additional shares for [€]47.50 [$68.91], a 39% discount on the Feb 8 closing price. Outside investors will have to buy additional dividend rights that would raise the cost to [€]71 [$103] per share, the bank said.

Also on Feb. 11, SocGen disclosed it suffered an additional $871 million in losses related to the U.S. real estate market, on top of $2.9 billion in subprime-related losses disclosed earlier this year. Among European banks, SocGen now ranks second in its subprime exposure, behind UBS (UBS) – though the Swiss bank's losses of $18 billion are much higher.

SocGen won't release official 2007 results until Feb. 21, but it is forecasting net earnings of $1.3 billion, down from nearly $7.8 billion in 2006.

51.    On February 15, 2008, the *International Herald Tribune* published an article entitled

"French trader's bets said to have generated alerts," which stated in part:

Someone deeply familiar with Société Générale's trading controls said it was "inconceivable" that Jérôme Kerviel's immediate supervisors were not alerted after his trades set off alarm bells at Eurex, the derivatives exchange based in Frankfurt.

The person, who requested anonymity because he was not authorized to speak to the media, lent credence to claims that Kerviel made during interrogation by the financial police that his superiors – experienced former traders – had received clear and repeated warnings that he was trading beyond his limits.

Separately, the French daily Le Parisien disclosed Thursday that the second stockbroker caught up in the scandal over Société Générale's $7.1 billion loss had told authorities that he knew Kerviel had a "problem" with supervisors.

"I knew that he had a problem with his bosses without knowing why," Moussa Bakir, a 32-year-old broker at Société Générale's futures brokerage, Newedge, told the police during questioning last week, according to Le Parisien.

The statement raised new questions about when Kerviel's superiors became aware of the scale of his unauthorized bets, and whether those bets had been the source of his problem with his bosses.

- 30 -

Kerviel told the police during his own interrogation in late January that his supervisors in the derivatives trading office - known as Delta One - had been familiar with his overreaching limits since April.

Those supervisors were Martial Rouyère, head of Delta One, and Rouyère's deputy, Éric Cordelle, according to lawyers with knowledge of the case.

"The only thing that was said to me is to manage a way to straighten it out," Kerviel said. "The other warnings that they get after don't make them react more."

Those warnings came in November, when the surveillance office at Eurex, the derivatives exchange, sent two e-mail messages to Société Générale's compliance department questioning transactions by Kerviel over the previous seven months.

According to the person familiar with Société Générale's control procedures, Rouyère and Cordelle, Kerviel's superiors, would have been contacted by compliance officers at Société Générale following up on the Eurex messages.

"A question like that, coming from outside, is something unusual," this person said.

Rouyère has been questioned by the authorities. A lawyer for Société Générale, Jean Veil, has said he expects Kerviel's "entire hierarchy" to be questioned.

On at least one occasion in late 2006 or early 2007, the person familiar with the trading controls said, Kerviel made a €500,000 profit on an unspecified one-way bet.

Kerviel's role on the trading desk did not allow him to speculate with the bank's money, and he was reprimanded by his bosses, who said his profit would not be included in the tally used to calculate year-end bonuses, according to the person familiar with the bank's controls.

The incident would have been sufficient grounds to fire Kerviel, this person said, and normally he would have been watched closely afterward.

"They should not have let Kerviel continue to take risks," he said.

52.    On February 20, 2008, the "Progress report of the Special Committee of the Board of

Directors of Société Générale" stated in part:

– [T]he absence of certain control measures for which no provision was made and which would have been liable to identify the fraud, essentially within OPER;

*No control exists over cancelled or modified transactions or over transactions with a deferred start date, or over transactions with technical*

*counterparties, or over positions with a high nominal, or over non-transactional flows during a given month, all analyses which would probably have allowed the fraud to be identified.*

\*    \*    \*

3.    MOTIVES AND POTENTIAL COLLUSION

. . . [W]e have not identified any indication of embezzlement of funds. It nevertheless appears that JK might have been able to take advantage of his fraudulent activities in order to increase his "official" P&L and therefore to increase indirectly the amount of flexible compensation that could be claimed by him for 2007.

53.    The Special Committee's progress report found that the Company had received dozens of alerts as to Kerviel's conduct. Specifically, the report found that the Company received six alerts between January of 2007 and January of 2008 regarding what were called "control of input." These included a transaction that purportedly occurred on a Saturday, when the markets were closed. The Company received 11 alerts between January and October 2007 regarding discrepancies in Kerviel's "front-back spreads/buffer banks" that warned, for example, that Kerviel had failed to supply the name of the broker for given trades. The Company received 13 alerts between March and October 2007 regarding "gateways," which flagged, among other things, the high nominal value of Kerviel's transactions. In February of 2007, SocGen received an alert of a discrepancy in a trade Kerviel claimed with Fimat Frankfurt. The Company received four alerts between June 2006 and August 2007 regarding problems with "settlement/delivery," reporting further discrepancies in Kerviel's trades. In December of 2007, SocGen was alerted to an unusually high commission (€1.2m) related to one of Kerviel's trades. Between December of 2006 and June of 2007, SocGen was warned on five occasions of cumulative discrepancies in Kerviel's trades in excess of €3.5 billion. The Company received alerts seven times between January and December of 2007 regarding tens of billions of euros in discrepancies between various accounts related to Kerviel. In July of 2007 and January of 2008, SocGen was notified of anomalies regarding counterparty risk,

including that Kerviel had exceeded the Company's internal risk limits.  Finally, SocGen generated

24 alerts between July 2006 and September of 2007  regarding market risk, including that Kerviel's

Delta One desk had exceeded its stress test limit for risk.

54.     On February 20, 2008, *The New York Times* published an article entitled "Document

Says Trader's Rogue Bets Began in Summer," which stated in part:

>      New details about the actions of a former trader accused of making billions of
> dollars of unauthorized bets at the French bank Société Générale showed that he
> exposed the bank to a significant trading loss in July, six months earlier than the bank
> has acknowledged.
>
>      According to a French court document obtained by The International Herald
> Tribune, the trader, Jérôme Kerviel, exposed the bank to a trading loss of 2.156
> billion euros ($3.16 billion) as of July 31, and a profit of 500 million euros a month
> later, on Aug. 31.
>
>      Société Générale, which is preparing to release on Wednesday the findings of
> its inquiry into the unauthorized trades, has revealed details of Mr. Kerviel's profits
> and losses dating back only to Dec. 31. The bank has said it booked 1.4 billion euros
> in profit in the fourth quarter from his unauthorized trades, and lost 4.82 billion euros
> in January from unwinding his bets.
>
>      Melody Jeannin, a Société Générale spokeswoman, declined to comment on
> any gains or losses linked to Mr. Kerviel's trading positions beyond what the bank
> has already publicly disclosed. Ms. Jeannin also would not say whether the discovery
> of the trading losses and gains for July and August might lead the bank to restate its
> financial results for the third quarter.
>
>      According to the document, Mr. Kerviel entered eight large transactions into
> the bank's computers on Dec. 12, consisting of four purchases of unspecified
> financial instruments and four sales. It was the eventual unwinding of these eight
> operations from Jan. 21 to Jan. 23 that led to the loss of 4.82 billion euros (more than
> $7 billion) announced last month.
>
>      The timeline indicates that Mr. Kerviel continued to place new unauthorized
> bets after his supervisors were alerted to potential problems. Eurex, the German
> bourse, communicated with Société Générale's compliance department from Nov. 7
> to Dec. 10 over the exchange's questions about Mr. Kerviel's trading activities.
>
> *             *             *
>
>      Risk management experts said the futures markets where Mr. Kerviel was
> active were liquid, with daily trading volumes valued in the hundreds of billions of

dollars. This allows individual traders to assume very large positions without drawing much attention. Still, a loss of the size that was on Mr. Kerviel's trading book in July would have been unlikely to escape notice in Société Générale's back office, they said.

"Large losses would have implied very large margin calls, which the bank would have had to cover in cash," said Jean Dermine, a specialist in asset and liability management at Insead, a leading French business school.

55. On February 21, 2008, *White Collar Crime Prof Blog* posted an article entitled

"Société Générale Isn't Too Hard On Itself Despite Losing $7.2 Billion," which stated in part:

When you are the victim of a $7.2 billion fraud perpetrated by an employee, one would think that there would be a fair measure of self-criticism for not detecting the misconduct. French banking giant Société Générale issued an progress report . . . on its internal investigation, called "Mission Green," into the losses caused by rogue trader Jerome Kerviel, based on the work of its General Inspection department – which sounds like the equivalent of the internal auditors – and reviewed by PriceWaterhouseCoopers. While Kerviel's unauthorized trades began in 2005 or 2006, they increased substantially in size in March 2007, and went undetected until mid-January 2008. That's nine months in which he took increasingly risky positions, estimated to total as much as 50 billion euros at the peak.

The obvious question is how Kerviel could get away with trading such huge amounts when he was a fairly low-level trader dealing in a narrow range of market indexes. The progress report is not particularly critical, making Kerviel's trading the result of what almost seems like just minor oversight glitch . . . .

Société Générale may give itself only a B- in the internal controls department, but it's hard to see any oversight system that misses such a large amount of unauthorized trading for nearly nine months as anything other than a abject failure. The bank continues to maintain that Kerviel acted alone, and to this point it hasn't identified any accomplices nor even any theft or personal enrichment from the trading. Kerviel admitted his role in the transactions, but asserts that there were warning signs about what he was doing that were ignored by his superiors, or perhaps even worse, they acquiesced in his conduct because at one point he had generated profits for Société Générale of over 1 billions euros.

### DEFENDANTS' SCIENTER

56. During the Class Period, the defendants had both the motive and opportunity to conduct fraud. They also had actual knowledge of the falsity of the statements they made or acted in reckless disregard of the truth or falsity of those statements. In so doing, the defendants participated

in a scheme to defraud and committed acts, practices and participated in a course of business that operated as a fraud or deceit on the Class during the Class Period.

57.     As defendants repeatedly stated, "risk management procedures are defined at the highest level of management."  Further, internal controls and compliance controls reported in a clearly defined chain of command to defendants, who were the top executives or directors at SocGen.  Given the extensive responsibilities that defendants assumed over risk management and internal controls, they either knew of SocGen's lax standards or recklessly disregarded them. Indeed, 75 separate alerts regarding Kerviel's unauthorized trades were issued and ignored during the Class Period, as well as an inquiry from Euronext.

### LOSS CAUSATION/ECONOMIC LOSS

58.     During the Class Period, as detailed herein, defendants made false and misleading statements that artificially inflated SocGen's stock and ADR prices and operated as a fraud or deceit on the Class.  Later, when defendants' prior misrepresentations and fraudulent conduct began to reach the market, SocGen's stock and ADR prices fell as the prior artificial inflation came out of the stock and ADR prices over time.  As a result of their purchases of SocGen stock and/or ADRs during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

### NO SAFE HARBOR

59.     SocGen's verbal "Safe Harbor" warnings accompanying its oral forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.

60.     The defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of SocGen who knew that the FLS was false.

None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

61.     Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     The omissions and misrepresentations were material;

(c)     The Company's stock and ADRs traded in efficient markets;

(d)     The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock and ADRs; and

(e)     Plaintiff and other members of the Class purchased SocGen stock and/or ADRs between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

62.     At all relevant times, the markets for SocGen stock and ADRs were efficient for the following reasons, among others:

(a)     As a regulated issuer, SocGen filed periodic public reports; and

(b)     SocGen regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major

news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5 Against All Defendants

63.    Plaintiff incorporates ¶¶1-62 by reference.

64.    During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

65.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)    Employed devices, schemes, and artifices to defraud;

(b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of SocGen stock and ADRs during the Class Period.

66.    Defendant Day further violated §10(b) by selling SocGen stock while in possession of material, adverse, non-public information.  While in possession of such information, Day was required to abstain from such sales or disclose the information to the public before selling.

67.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for SocGen stock and ADRs.  Plaintiff and the Class would not have purchased SocGen stock and ADRs at the prices they paid, or at all, if they had been

aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

68.     As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of SocGen stock and ADRs during the Class Period.

## COUNT II

### For Violation of §20(a) of the 1934 Act Against All Defendants

69.     Plaintiff incorporates ¶¶1-68 by reference.

70.     The Individual Defendants acted as controlling persons of SocGen within the meaning of §20 of the 1934 Act. By virtue of their positions and their power to control public statements about SocGen, the Individual Defendants had the power and ability to control the actions of SocGen and its employees. SocGen controlled the Individual Defendants and its other officers and employees. By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

## CLASS ACTION ALLEGATIONS

71.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all purchasers of SocGen ADRs and all U.S. residents and citizens who purchased SocGen stock during the Class Period (the "Class"). Excluded from the Class are defendants, directors and officers of SocGen and their families and affiliates.

72.     The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. SocGen had more than 466 million shares of stock outstanding, owned by thousands of persons.

73.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     Whether the 1934 Act was violated by defendants;

(b)     Whether defendants omitted and/or misrepresented material facts;

(c)     Whether defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     Whether defendants knew or recklessly disregarded that their statements were false and misleading;

(e)     Whether the prices of SocGen stock and ADRs were artificially inflated; and

(f)     The extent of damage sustained by Class members and the appropriate measure of damages.

74.     Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

75.     Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

76.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.     Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.     Awarding plaintiff and the members of the Class damages and interest;

C.     Awarding plaintiff's reasonable costs, including attorneys' fees; and

D.     Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  March 14, 2008                COUGHLIN STOIA GELLER
                                        RUDMAN & ROBBINS LLP
                                      SAMUEL H. RUDMAN


                                           /S/ Samuel H. Rudman
                                      _____
                                            SAMUEL H. RUDMAN

                                      58 South Service Road, Suite 200
                                      Melville, NY  11747
                                      Telephone:  631/367-7100
                                      631/367-1173 (fax)

                                      COUGHLIN STOIA GELLER
                                        RUDMAN & ROBBINS LLP
                                      DARREN J. ROBBINS
                                      MATTHEW P. MONTGOMERY
                                      655 West Broadway, Suite 1900
                                      San Diego, CA  92101
                                      Telephone:  619/231-1058
                                      619/231-7423 (fax)

                                      Attorneys for Plaintiff

S:\CptDraft\Securities\Cpt SocGen.doc