**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____
PHILLIP BARKETT, JR., Individually and On )
Behalf of All Others Similarly Situated,   )
                                           )     **08-CV-2495 (GEL) (DF)**
                      Plaintiff,           )
                                           )
             vs.                           )
                                           )
SOCIÉTÉ GÉNÉRALE, DANIEL BOUTON, and       )
ROBERT A. DAY,                             )
                                           )
                      Defendants.          )
_____


**MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION OF PROPOSED LEAD PLAINTIFF HAROLD OBERKOTTER**
**FOR CONSOLIDATION, APPOINTMENT AS LEAD PLAINTIFF AND**
<u>**APPROVAL OF SELECTION OF LEAD COUNSEL**</u>

| | |
|---|---|
| CITY OF TAYLOR EMPLOYEES RETIREMENT SYSTEM, Individually and On Behalf of All Others Similarly Situated,<br><br>      Plaintiff,<br><br>    vs.<br><br>SOCIÉTÉ GÉNÉRALE, DANIEL BOUTON, and ROBERT A. DAY,<br><br>      Defendants. | **08-CV-2752 (GEL) (DF)** |
| HAROLD OBERKOTTER, Individually and On Behalf of All Others Similarly Situated,<br><br>      Plaintiff,<br><br>    vs.<br><br>SOCIÉTÉ GÉNÉRALE, DANIEL BOUTON, and ROBERT A. DAY,<br><br>      Defendants. | **08-CV-2901 (GEL) (DF)** |

**TABLE OF CONTENTS**

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

PROCEDURAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        POINT I -     THE ACTIONS SHOULD BE CONSOLIDATED . . . . . . . . . . . . . . . . . . 7

        POINT II -    MOVANT SHOULD BE APPOINTED LEAD PLAINTIFF . . . . . . . . . . 7

        A.     The Procedure Required By The PSLRA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        B.     Movant Satisfies The "Lead Plaintiff" Requirements of the PSLRA . . . . . . . . . . 9

              1.     Movant Has Complied With The PSLRA
                   And Should Be Appointed Lead Plaintiff . . . . . . . . . . . . . . . . . . . . . . . . 9

              2.     Movant Has The Largest Financial Interest
                   In The Relief Sought By The Class . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

              3.     Movant Otherwise Satisfies Rule 23 . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        POINT III -   MOVANT'S CHOICE OF COUNSEL SHOULD BE APPROVED . . . 12

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Proposed Lead Plaintiff Harold Oberkotter ("Oberkotter" or "Movant") hereby respectfully submits this memorandum of law in support of his motion for: (i) consolidation; (ii) appointment as Lead Plaintiff pursuant to the Private Securities Litigation Reform Act of 1995 (the "PSLRA"); and (iii) approval of his selection of Weiss & Lurie as Lead Counsel.

## INTRODUCTION

Oberkotter purchased 6,000 American Depository Receipts ("ADRs") of Société Générale ("SocGen" or the "Company"), and suffered estimated losses of $41,480.60 as a result of defendants' misconduct between August 1, 2005 and January 23, 2008 (the "Class Period"). Accordingly, Movant believes he is the investor with the largest financial interest in the outcome of the litigation and therefore, seeks to consolidate the captioned cases and be appointed Lead Plaintiff. Additionally, Movant seeks Court approval of his selection of Weiss & Lurie as Lead Counsel.

As discussed more fully below, Movant has satisfied each of the requirements of the PSLRA and, therefore, is qualified for appointment as Lead Plaintiff. More importantly, upon information and belief, he has the largest losses in the litigation of any filed plaintiff and is the most adequate representative of the class on this score. Furthermore, Movant's counsel is qualified to serve as lead counsel and should be approved by this Court as lead counsel for the Class.

## PROCEDURAL BACKGROUND

On or about March 12, 2008, the first of the captioned actions, <u>Barkett v. Société Générale et al.</u>, Case No. 08-cv-2495, was filed in this Court. Also, that same day, on March 12, 2008, notice of the pendency of the <u>Barkett</u> action was published over <u>Business Wire</u>, advising

1

members of the proposed class of their right to move the Court to serve as lead plaintiff no later than sixty (60) days from the date of publication of the Notice, i.e., by May 12, 2008. Subsequently, on March 14, 2008 the second captioned action was filed, City of Taylor Employees Retirement System v. Société Générale, et al., Case No. 08-cv-2752. On or about March 19, 2008, Oberkotter filed his complaint.

## STATEMENT OF FACTS

Defendant SocGen is a French corporation with operations throughout the world, including significant operations in the United States, where it "is one of the largest foreign banking organizations in the United States with approximately 2,900 professionals working in 13 U.S. cities." Its New York offices are located at 1221 Avenue of the Americas, New York, New York.  ¶ 11.[1]

Defendant Daniel Bouton ("Bouton") is and has been Chief Executive Officer of SocGen since 1993, and Chairman of SocGen since 1997. Defendant Robert A. Day ("Day") is and has been a member of SocGen's board of directors since 2002. He is Chairman and an investment manager of SocGen's United States subsidiary, Trust Company of the West ("TCW") ¶¶ 12-13.

Beginning on or about August 1, 2005, the Company and the individual defendants made materially false and misleading statements and concealed material adverse information regarding: (1) SocGen's risk management procedures, policy and practices; (2) SocGen's exposure to subprime real estate loans and collateralized debt obligations ("CDOs"), and (3) SocGen's internal controls.  ¶ 2.

---

[1] References to "¶__" are to the complaint filed in the Oberkotter Action.

Specifically, SocGen represented, among other things, that: it is committed to "conservative provisioning, active risk management and vigilance" and "strict procedures"; the derivatives offered by the Company's Corporate and Investment Banking arm ("CIB") are an "innovative and effective investment product" that has been implemented to boost revenues "using a selective, structured approach . . . while at the same time maintaining a firm grip" on risk exposure; the Company's internal control department has implemented necessary actions "to ensure that operational risk is maintained at or reduced to an acceptable level; "a number of highly sophisticated control systems which have already proved their worth in extreme situations" and that "even in extreme situations, the degree of risk remains acceptable" for the Company; the Company performs "daily reviews of all positions and risks"; that it has "recognized expertise" in derivative products, securitization and structured finance; and that it has "very little exposure" to the subprime segment of the United States real estate market or to the then current credit market crisis. ¶¶ 3, 17- 39.

These representations were materially false and misleading and resulted in an artificial inflation of SocGen's ADRs. The disclosures of truth at the end of the Class Period caused the price of SocGen's ADRs and its other securities to decline, damaging Movant and the Class. ¶ 6.

Specifically, on January 24, 2008, the end of the Class Period, SocGen issued a press release disclosing that it had written down €2.05 billion for the fourth quarter of 2007, including €1.1 billion in relation to US residential mortgage risk, €550 million from exposure to US monoline insurers, and €400 million in additional provision to the aforementioned exposures. At the same time, it disclosed that it had "uncovered an exceptional fraud" and suffered losses amounting to almost five billion euros or over $7 billion dollars because of unauthorized trading

by Jerome Kerviel ("Kerviel"), one of the Company's derivatives traders on SocGen's equity derivatives trading desk. Kerviel engaged in massive, high risk "directional" trading, concealed his positions with fictitious counterbalancing trades, and used forged documents and emails to suggest that he had hedged is positions. ¶¶ 40, 42-43.

SocGen's ADRs fell $1.95, from a close of $24.25 on January 23 to close at $22.30 on January 24, 2008 (and continued to drop over the next 2 trading days to $21.50), on extremely heavy trading volume (over 2,500,000 ADR shares), removing the artificial inflation from the ADR stock price. ¶ 90.

On February 11, 2008, SocGen issued a press release disclosing that it had written down and taken loss provisions amounting to €2.6 billion (U.S. $3.8 billion) for 2007, over and above the cumulative total of €2.28 billion previously disclosed for the fourth and third quarters. The €2.6 billion in subprime writedowns and provisions, included €1.250 billion related to its portfolio of non-hedged collaterised debt obligations (CDOs), €947 million related to counterparty risk involving monoline insurers, and £325 million related to the trading portfolio of residential mortgage-backed securities (RMBS). These losses, writedowns and provisions were exacerbated by the 4.9 billion euro ($7.58 billion) loss by the "unauthorized" futures trading by Kerviel. ¶¶ 41-43.

Two weeks prior to these disclosures, defendant Day, and foundations related to him, sold more than $140 million of SocGen stock at artificially inflated prices. ¶ 5.

Throughout the Class Period the Company had received numerous warnings regarding Kerviel's illegal trading. According to an interim investigative report issued by three independent board members, SocGen management failed to follow up on 75 warnings over more

than two years about Kerviel's trading, including a letter directly from Eurex at the end of 2007 alerting a compliance officer at SocGen that for seven months, Kerviel had engaged in "several transactions" that had raised red flags. An interim investigative report also concluded that SocGen's "operating staff did not systematically carry out more detailed checks," and certain controls which might have identified the fraud were absent and not provided for. ¶¶ 44-45.

Furthermore, on February 5, 2008, The New York Times reported that, in addition to failing to sufficiently investigate after receipt of Eurex's warnings, other missteps by SocGen, and a "culture of risk" at SocGen resulted in Kerviel's losses:

> Overlooking the warnings by Eurex about Mr. Kerviel was only one of a series of missteps by Société Générale that led to his staggering loss.
>
> The 144-year old bank allowed a culture of risk to flourish, creating major flaws in operations that enabled the rogue trader's activities to go undetected, according to bank officials, investigators and traders who worked with Kerviel.
>
> Far from being discouraged from placing big bets, Société Générale traders were rewarded for making risky investments with the bank's money. It was not uncommon for traders to briefly exceed limits imposed on their trading before pulling back, despite controls meant to prohibit this.
>
> While management depicts the 31-year-old Mr. Kerviel as a lone operator who spiraled out of control, interviews with current and former Société Générale employees suggest that he was also the product of an environment where risk taking was embraced, as long as it made money for the bank.
>
> The damage wrought by Mr. Kerviel comes in the wake of two trends that reshaped Société Générale: the explosive growth of its derivatives business and its use of its own money to make bets on the market, known as proprietary trading.
>
> Throughout Société Générale's sprawling derivatives business, said one current employee who used to work with Mr. Kerviel, traders were encouraged to make proprietary bets, even on desks that specialized in what top executives called "plain vanilla products," like the team where Mr. Kerviel worked, Delta One.

> "You must take positions, even if you are not a proprietary trader," said this employee, who insisted on anonymity because he was not authorized to talk to the press. "During appraisals by bosses, they made it clear you were judged by how well you did your basic job, as well as how much money you made on prop trades."
>
> Mr. Kerviel told French prosecutors as much. Asked if his superiors knew of his activities, be said, "at the beginning, just as at the end of my maneuvers, they didn't want to intervene," adding, "They know the machinery."

¶ 47. Emphasis added.

On February 4, 2008, French Finance Minister Christine Lagarde submitted an 11-page report to the French prime minister on the SocGen which stated, among other things: "Very clearly, certain mechanisms of internal controls of Société Générale did not function, and those that functioned were not always followed by appropriate modifications." Among problems the report cited at Société Générale were cracks in the wall separating the trading floor and the offices where trades are controlled and problems with computer passwords and other security measures. ¶¶ 55-56.

In the wake of the revelations of SocGen's true condition, on March 19, 2008, this federal securities class action was brought by plaintiff on behalf of himself and all other purchasers of SocGen ADRs, as well as all United States citizens who purchased SocGen securities on a foreign exchange during the Class Period. The action alleges that SocGen and the individual defendants made materially false and misleading statements and concealed material adverse information regarding the Company during the Class Period.

# ARGUMENT

## POINT I

### THE ACTIONS SHOULD BE CONSOLIDATED

The captioned Actions involve class action claims asserted on behalf of all purchasers of SocGen ADRs as well as all United States citizens who purchased SocGen securities on foreign exchanges and assert essentially similar and overlapping class claims for relief. Consolidation is appropriate where, as here, there are multiple actions involving common questions of law or fact. See Fed. R. Civ. P. 42 (a); Johnson v. Celotex Corp., 899 F.2d 1281, 1284 (2d Cir.), cert. denied, 498 U.S. 920 (1990). That test is met here and the Actions should be consolidated.

## POINT II

### MOVANT SHOULD BE APPOINTED LEAD PLAINTIFF

A.  **The Procedure Required By The PSLRA**

The PSLRA has established a procedure that governs the appointment of a lead plaintiff in "each private action arising under [the Securities Act Exchange Act of 1934] that is brought as a plaintiff class action pursuant to the Federal Rules of Civil Procedure." 15 U.S.C. § 78u-4(a)(1).

First, the plaintiff who files the initial action must publish a notice to the class, within 20 days of filing the action, informing class members of their right to file a motion for appointment as lead plaintiff. 15 U.S.C. § 78u-4(a)(3)(A)(i). Plaintiff in the Barkett Action caused notice to be published on Business Wire on March 12, 2008.[2] See Declaration of Joseph H. Weiss

---

[2] Wire services have consistently been recognized as a suitable vehicle for meeting the statutory requirement that notice be published "in a widely circulated national business-oriented publication or wire service." See Lax v. First Merchants Acceptance Corp., 1997 U.S. Dist.

("Weiss Decl."), Exhibit A.  Within 60 days after publication of the notice, any person or group of persons who are members of the proposed class may apply to the Court to be appointed as lead plaintiff, whether or not they have previously filed a complaint in the action. 15 U.S.C. § 78u-4 (a)(3)(A) and (B).

Second, the PSLRA provides that within 90 days after publication of the notice the Court shall consider any motion made by a class member and shall appoint as lead plaintiff the member or members of the class that the Court determines to be most capable of adequately representing the interests of class members.  15 U.S.C. § 78u-4 (a)(3)(B).  In determining the "most adequate plaintiff," the PSLRA provides that:

> [T]he court shall adopt a presumption that the most adequate plaintiff in any private action arising under this title is the person or group of persons that - -
>
> (aa)   has either filed the complaint or made a motion in response to a notice . . .;
>
> (bb)   in the determination of the court, has the largest financial interest in the relief sought by the class; and
>
> (cc)   otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

15 U.S.C. § 78u-4 (a)(3)(B)(iii).  See generally Greebel v. FTP Software, 939 F. Supp. 57, 64 (D. Mass. 1996).

---

LEXIS 11866 at *2 (N.D. Ill. Aug. 6, 1997).

**B.     Movant Satisfies The "Lead Plaintiff" Requirements of the PSLRA**

    **1.     Movant Has Complied With The PSLRA
And Should Be Appointed Lead Plaintiff**

The time period in which class members may move to be appointed lead plaintiffs under 15 U.S.C. § 78u-4 (a)(3)(A) and (B) expires on May 12, 2007.  Pursuant to the provisions of the PSLRA and within the requisite time frame after publication of the required notice (published on March 12, 2008), Movant herein timely moves this Court to be appointed Lead Plaintiff on behalf of all members of the class.

Movant has filed a complaint and is willing to serve as a representative party on behalf of the Class as evidenced by his duly executed certification. See Weiss Decl., Exhibit B.  In addition, Movant has selected and retained experienced and competent counsel to represent him and the Class.  See Weiss Decl., Exhibit C.

Accordingly, Movant has satisfied the individual requirements of 15 U.S.C. § 78u-4 (a)(3)(B) and is entitled to have his application for appointment as Lead Plaintiff and his selection of Lead Counsel, as set forth herein, considered and approved by the Court.

    **2.     Movant Has The Largest Financial Interest
In The Relief Sought By The Class**

According to 15 U.S.C. § 21(a)(3)(B)(iii), the court shall appoint as lead plaintiff the class member or members who represent the largest financial interest in the relief sought by the class.

During the Class Period, as evidenced by, among other things, the accompanying signed certification, Movant Oberkotter purchased 6,000 of the Company's ADRs and suffered

estimated losses of $41,480.60 as a result of defendants' misconduct.  See Weiss Decl., Exhibit B.

Moreover, Movant is unaware of any other plaintiff or lead plaintiff applicant who has a larger loss.  As such, Movant has the greatest financial interest in the relief sought by the class in this litigation.  Movant satisfies all of the PSLRA's prerequisites for appointment as Lead Plaintiff and should be appointed Lead Plaintiff pursuant to 15 U.S.C. § 78u-4 (a)(3) (B).

### 3.     Movant Otherwise Satisfies Rule 23

According to 15 U.S.C. § 78u-4(a)(3)(B), in addition to possessing the largest financial interest in the outcome of the litigation, the lead plaintiff must also "otherwise satisf[y] the requirements of Rule 23 of the Federal Rules of Civil Procedure."  Rule 23(a) provides that a party may serve as a class representative only if the following four requirements are satisfied:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Of the four prerequisites to class certification, only two -- typicality and adequacy -- directly address the personal characteristics of the class representatives.  Consequently, in deciding a motion to serve as lead plaintiff, the Court should focus its inquiry on the typicality and adequacy prongs of Rule 23(a).  Lax v. First Merchants, 1997 U.S. Dist. LEXIS 11866, at *20; Fischler v. Amsouth Bancorporation, 1997 U.S. Dist. LEXIS 2875, at *7-8 (M.D. Fla. Feb. 6, 1997).

Here, the Movant satisfies both the typicality and adequacy requirements of Rule 23, thereby justifying his appointment as Lead Plaintiff. Typicality exists if claims "arise[] from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." See In re Drexel Burnham Lambert Group, Inc., 960 F.2d 285, 291 (2d Cir. 1992), cert. dismissed sub nom., 506 U.S. 1088 (1993). However, the claims of the class representatives need not be identical to the claims of the class to satisfy typicality. Instead, the courts have recognized that:

> [T]he typicality requirement may be satisfied even if there are factual dissimilarities or variations between the claims of the named plaintiffs and those of other class members, including distinctions in the qualifications of the class members.

Bishop v. New York City Dept. of Housing Preservation and Development, 141 F.R.D. 229, 238 (2d Cir. 1992); See also Avagliano v. Sumitomo Shoji America, Inc., 103 F.R.D 562, 582 (S.D.N.Y. 1984).

As set forth above, Movant seeks to represent a class of purchasers of SocGen's ADRs and all citizens of the United States who purchased SocGen securities on foreign exchanges during the Class Period. Thus, typicality is satisfied since the claims asserted by Movant arise "from the same event or course of conduct that gives rise to claims of other class members and the claims are based on the same legal theory." Walsh v. Northrop Grumman Corp., 162 F.R.D. 440, 445 (E.D.N.Y. 1995).

Under Rule 23(a)(4) the representative party must also "fairly and adequately protect the interests of the class." The standard for adequacy of representation under Rule 23(a)(4) is met by: (1) the absence of potential conflicts between the named plaintiff and the class members, and

(2) the class representative's choice of counsel who is qualified, experienced and able to vigorously conduct the proposed litigation. Garfinkel v. Memory Metals, Inc., 695 F. Supp. 1397, 1405 (D. Conn. 1988).

 Here, Movant is the most adequate representative of the Class. The interests of Movant are clearly aligned with the members of the Class and there is no evidence of any antagonism between Movant's interests and those of the other members of the Class he seeks to represent. In addition, as shown below, the Movant's proposed Lead Counsel is highly qualified, experienced and able to conduct this complex litigation in a professional manner. Thus, Movant prima facie satisfies the commonality, typicality and adequacy requirements of Rule 23.

## POINT III

### MOVANT'S CHOICE OF COUNSEL SHOULD BE APPROVED

 Pursuant to 15 U.S.C. § 78u-4 (a)(3)(B)(v), the lead plaintiff shall, subject to Court approval, select and retain counsel to represent the class he seeks to represent. In that regard, Movant has selected Weiss & Lurie to serve as Lead Counsel. Weiss & Lurie has extensive experience in successfully prosecuting shareholder and securities class actions, and has frequently appeared in major actions in this and other courts. See Weiss Decl., Exhibit C.

## CONCLUSION

For all the foregoing reasons, Movant respectfully requests that the Court grant his request for appointment as Lead Plaintiff and approve his selection of Lead Counsel.

Dated: May 12, 2008

                                                Respectfully submitted,

                                                **WEISS & LURIE**

                                                By: /s/ Joseph H. Weiss
                                                Joseph H. Weiss  (JW-4534)
                                                Mark D. Smilow (MS-2809)
                                                Joshua M. Rubin (JR-5168)
                                                551 Fifth Avenue
                                                New York, New York 10176
                                                (212) 682-3025
                                                (212) 682-3010 (Fax)

                                                **Attorneys for Plaintiff Harold Oberkotter**